## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Timeless Bar, Inc., *doing business as* The Press Bar and Parlor, and Horseshoe Club, LLC, | No. 22-cv-1685 (KMM/LIB) |
| Plaintiffs, | |
| v. | **ORDER** |
| Illinois Casualty Company, | |
| Defendant. | |

Plaintiffs Timeless Bar, Inc. and Horseshoe Club, LLC brought this action against their insurer, Defendant Illinois Casualty Company, claiming the latter breached the parties' insurance agreement. Specifically, the Plaintiffs allege that even though the fire that destroyed their property was intentionally set by an officer of the corporation and a member of the LLC, the insurer was obligated under the policy and Minnesota law to pay for the loss. This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons that follow, the Defendant's motion is granted, the Plaintiffs' motion is denied, and this matter is dismissed with prejudice.

### BACKGROUND

### I.    The Plaintiffs' Businesses

In April 2016, while still a married couple, Andrew Welsh and Jessie Welsh purchased a bar in St. Cloud, Minnesota. They bought it from the previous owners on a contract for deed for $500,000. Prouty Decl., Ex. 7 (Doc. 63). The couple opened the

business as The Press Bar and Parlor and operated it through a corporation, Timeless Bar, Inc. ("Timeless Bar"). They also set up a real estate holding company, Horseshoe Club, LLC ("Horseshoe Club"), and arranged the building purchase through that company. This case arises out of a February 17, 2020 fire that destroyed the bar. The Defendant and law enforcement later discovered that Andrew intentionally set the fire.

Andrew and Jessie incorporated Timeless Bar on February 18, 2016. Prouty Decl., Ex. 5. The company's articles of incorporation provide that the Chief Executive Officer would

> control all of the business and affairs of the Corporation [and] have authority to sign, execute, and acknowledge, on behalf of the Corporation, all deeds, mortgages, bonds, stock certificates, contracts, leases, reports, and all other documents or instruments necessary or proper to be executed in the course of the Corporation's regular business.

Prouty Decl., Ex. 6, Timeless Bar Bylaws, Art. IV, § 5; Alton Decl., Ex. 1.[1] Andrew was the CEO of Timeless Bar. Timeless Bar Bylaws at TB00013 (signature block "Andrew Welsh, CEO"). He was also its majority owner, holding 510 shares, while Jessie owned the other 490 shares. *Id.*, Ex. 4, J. Welsh Dep. 114–116; *id.*, Ex. 7, Asset Purchase Agreement at 18 (signed by Andrew Welsh as CEO of Timeless Bar). As the CEO,

---

[1] The copies of both the corporation's bylaws and the limited liability company's membership operating agreement in the record are unexecuted. The executed versions were apparently destroyed in the fire. Aside from the fact that the operating agreement for Horseshoe Club contains a few references in its headings to a different, unaffiliated business known as "Legacy Place, LLC," *see* Alton Decl., Ex. 4 at 7–9, the parties do not dispute that these documents accurately reflect the terms governing operations of both Timeless Bar and Horseshoe Club.

Andrew was authorized to obtain insurance and submit insurance claims on behalf of the company. J. Welsh Dep. 188–90.

The Welshes formed the Horseshoe Club on April 1, 2016, and Andrew and Jessie were the LLC's only two members. Prouty Decl., Ex. 3, Horseshoe Operating Agreement. Andrew was the chief executive manager and president of the Horseshoe Club. *Id.* at HC00031–32.[2] Andrew had primary responsibility for the LLC's operations and signed all legal documents on the company's behalf. *Id.*, Art. 4, § 4.4.

Timeless Bar obtained insurance under a Businessowners Policy (the "Policy") with Defendant Illinois Casualty Company ("ICC"). Prouty Decl., Ex. 2, ICC Policy. The Horseshoe Club was covered as an additional named insured – "building owner" – for certain losses associated with the building itself under the Policy. *Id.* at BP AI 04 09 14 ("The building owner identified in this endorsement is a Named Insured, but only with respect to the coverage provided under this Coverage Form for direct physical loss or damage to the building(s) designated in the Schedule of this endorsement."). Andrew submitted the application for insurance to ICC on behalf of Timeless Bar and the Horseshoe Club. Prouty Decl., Ex. 9; J. Welsh Dep. 188–89. Following the execution of the Policy, Andrew called and communicated with the companies' insurance agent whenever there was a claim. J. Welsh Dep. 190.

---

[2] Jessie was also listed as Horseshoe Club's "president, secretary, and treasurer." Prouty Decl., Ex. 3 at HC00031–32.

## II.  The Welshes' Divorce

Andrew and Jessie divorced in November 2019. J. Welsh Dep. 10; Alton Decl., Ex. 8. Andrew retained all of the bank accounts for Horseshoe Club and Timeless Bar in the divorce. J. Welsh Dep. 71–72; Alton Decl., Ex. 8 at 19. The businesses had originally banked with US Bank, but prior to the divorce Andrew had moved the banking accounts to MidCountry Bank. J. Welsh Dep. 127–28. Jessie was removed as a signatory on the MidCountry accounts by the end of 2019. J. Welsh Dep. 64–65, 135. In February 2020, at the time of the fire, Jessie had no electronic access to the MidCountry accounts. J. Welsh Dep. 64, 129.

Leading up to the divorce, Jessie had become less involved in the operation of the bar and the Horseshoe Club. J. Welsh Dep. 49–50. Although Jessie had originally been responsible for making payments to the former owners of the building, Andrew had taken over those duties near the end of 2018. J. Welsh Dep. 138–40. He also took over payroll-related responsibilities by March 2019. J. Welsh Dep. 143–47. Andrew verified inventory for the bar, tracked sales, reported sales to the outside accountant every month, made bank deposits except when he asked Jessie to do that for him, and placed orders and took deliveries for the bar. J. Welsh Dep. 148, 158; Prouty Dep., Ex. 16 at 9. At the time of the fire, Jessie did not have a key to the bar and Andrew had changed the locks. J. Welsh Dep. 187–88.

However, it is clear that after the bar was purchased in 2016, Jessie had some responsibilities for operating the bar at various times throughout its existence. Though she didn't specify the precise dates, Jessie indicated that she did the following tasks:

4

calculating inventory; addressing payroll issues; garnishing payroll; processing workers' compensation claims; handling a variety of tax-related issues; making bank deposits; paying bills; obtaining office supplies; maintaining paperwork and handling other administrative matters; seeking legal representation when necessary; and reviewing contracts. She also maintained a food manager certification, which had to be renewed every three years, and was required to renew a food license annually. Prouty Decl., Ex. 21. It is also undisputed that the bar and restaurant needed Jessie to maintain the food license and certification to continue operating.

### III.    The Arson and Plaintiffs' Insurance Claims

On February 17, 2020, Andrew Welsh burned down the bar. *See* Prouty Decl., Ex. 1, Plea Agreement. The following day, Andrew executed a Non-Waiver Agreement with ICC as the authorized representative of Timeless Bar as a named insured under the Policy.[3] Prouty Decl., Ex. 10. On February 26, 2020, Timeless Bar and the Horseshoe Club submitted the initial insurance claim to ICC via a "Proof of Loss" seeking approximately $1.4M in proceeds. Prouty Decl., Ex. 11, 2/26/20 Proof of Loss. The initial claim sought the policy limits for the building and other amounts. *Id.* at 1. The claim states that the fire was of "unknown origin." *Id.* at 3 ¶ 1. Further, the sworn proof of loss states:

> That said loss did not originate by any act, design or
> procurement on the part of your insured, or as affiant; nothing

---

[3] The Non-Waiver Agreement provided that no action of ICC would be deemed a waiver of its right to deny liability under any policy and clearly referred to the "Named Insured" as "Timeless Bar Incorporated dba The Press Bar and Parlor," with Andrew signing as "Authorized representative of Named Insured." Prouty Decl., Ex. 10.

> has been done by or with the privity or consent of your
> insured or this affiant, to violate the conditions of the policy,
> or render it void. . . .

*Id.* at 4. Andrew and Jessie both signed that proof of loss on behalf of the businesses. *Id.*; J. Welsh Dep. 196–97. There is no dispute that in the proof of loss, Andrew falsely stated that the fire was of unknown origin and that the loss did not originate by any act, design, or procurement of his own. Nor is there any dispute that his submission of the false claim as an affiant on behalf of the insured was an effort to defraud ICC.

On May 15, 2020, the Plaintiffs submitted an updated Proof of Loss, increasing the amount of the claim to just over $1.6M. Prouty Decl., Ex. 12. On June 1, 2020, the Plaintiffs submitted another amended Proof of Loss seeking more than $1.9M, an increase based on claimed damages to business personal property ("BPP") of more than $300,000. Prouty Decl., Ex. 13, 6/1/20 Proof of Loss. Jessie signed the June 1st amended claim, but the BPP amount was based on an inventory list that Andrew provided. Prouty Decl., Ex. 14; J. Welsh Dep. 201. Like the original Proof of Loss, the June 1st Proof of Loss states that the fire was of unknown origin and that the loss did not originate by any act of the insured or the affiant. 6/1/20 Proof of Loss at 1–2.

On November 17, 2020, Andrew was indicted on charges of arson, use of a fire to commit a federal felony, and wire fraud. *United States v. Welsh*, No. 20-cr-270 (ECT/LIB), Doc. 1 (D. Minn. Nov. 17, 2020) (Indict.). On May 4, 2022, eleven days before his case was set to go to trial, Andrew pled guilty in federal court to arson and admitted to doing so as part of a scheme to defraud ICC to enrich himself. Plea Agreement ¶ 2 (admitting, among other things, that "he carried out a scheme to defraud

6

and obtain insurance money and property from Illinois Casualty Company" by filing "one or more fraudulent insurance claims with [ICC] seeking payment of money to [Andrew], through his company, Timeless Bar, Inc."). On September 30, 2022, he received a 71-month sentence. *United States v. Welsh*, No. 20-cr-270 (ECT/LIB), Doc. 109 (D. Minn. Sept. 30, 2022) (Sentencing Judgment).

After Andrew pled guilty, ICC denied the Plaintiffs' insurance claims. ICC essentially relied on three separate exclusions in the Policy based on Andrew's conduct. Alton Decl., Exs. 15, 16. The first two exclusions—(1) Concealment, Misrepresentation, or Fraud ("Misrepresentation Exclusion") and (2) Dishonest Acts ("Dishonesty Exclusion")—were based on Andrew's submission of fraudulent claims. The Misrepresentation Exclusion precludes coverage when a Named Insured has "[a]fter a loss, willfully and with intent to defraud . . . concealed or misrepresented any material fact or circumstances concerning . . . [a] claim under this Policy." ICC Policy, Minnesota Changes, § A.4.C. The Dishonesty Exclusion provides that ICC "will not pay for loss or damage caused by or resulting from . . . dishonest or criminal acts by you, . . . or any of your . . . 'members', executive officers, 'managers', 'employees', directors, [or] an 'authorized representative' of . . . you." Policy, Businessowners Property Coverage Form § C.3.b(4). The Policy defines "you" as the Named Insureds—Timeless Bar and Horseshoe Club. *Id.* at 1 of 52. An authorized representative of the insured includes any member or manager of an LLC and an officer of a corporation. *Id.*, § H.1.c(3), H.1.c(5). Essentially, ICC treats these two exclusions synonymously and contends that Andrew's

submission of the fraudulent claims on behalf of the Plaintiffs were the acts of the two business entities.

The third exclusion at issue is the Intentional Act exclusion, which provides that ICC "will not pay for loss or damage arising out of any act committed . . . [b]y or at the direction of any insured; and . . . with the intent to cause a loss." ICC Policy, Businessowners Property Coverage Form § C.3.b(17). According to ICC, this exclusion applies to Andrew's act of arson. ICC asserts that his conduct, as the person who was solely in charge of the day-to-day operations of the two businesses, is imputed to the Plaintiffs for purposes of determining the application of the Intentional Act exclusion—*i.e.*, Andrew's intent to cause a loss is the Plaintiffs' intent to cause a loss.

Through the corporation in which she holds an ownership interest and the LLC of which she is a member, Jessie Welsh disagrees with ICC's application of the three exclusions discussed above. There is no evidence before the Court that Jessie was involved in the arson. Nor is there evidence in the record indicating that she was aware, at the time the relevant proofs of loss were filed, that Andrew had started the fire. In other words, there is no suggestion that Jessie knew the insurance claims provided to ICC contained Andrew's fraudulent statements about the fire being of "unknown origin." *See* Alton Decl., Ex. 14, Galbraith Decl. 52–54.

## DISCUSSION

Both sides seek summary judgment. At bottom, the crux of the dispute in this case is whether Andrew Welsh's conduct—burning down the bar and later lying about it in the insurance claims—allows ICC to deny coverage to Timeless Bar and Horseshoe Club.

ICC argues that Andrew's conduct is imputable to the Plaintiffs for purposes of all three exclusions at issue: his submission of fraudulent insurance claims precludes coverage for the Plaintiffs under the Misrepresentation and Dishonesty Exclusions, and his arson precludes coverage under the Intentional Acts Exclusion. Plaintiffs argue that they are innocent business entities who are the named insureds, and if ICC is allowed to deny coverage based on those exclusions, the protections for innocent insureds recognized under Minnesota law and the standard fire insurance policy would be eliminated. In relevant part, the Minnesota standard fire insurance policy states:

> This entire policy shall be void if, whether before a loss, the insured has willfully, or after a loss, the insured has willfully and with intent to defraud, concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interests of the insured therein.

Minn. Stat. § 65A.01, subd. 3.[4] Plaintiffs assert that ICC's denial of coverage causes the Policy to provide less than the minimum coverage required by this provision, so the Policy must be reformed so that it conforms

As explained below, the Court finds that there is no genuine dispute that Andrew filed fraudulent claims on behalf of both Timeless Bar and Horseshoe Club. Because he did so, no reasonable jury could find that ICC breached the Policy by denying coverage under either the Misrepresentation Exclusion or the Dishonesty Exclusion. Neither the Minnesota standard fire policy, nor the Minnesota case law relied upon by the Plaintiffs precludes application of these exclusions under the circumstances presented. ICC is,

---

[4] The Misrepresentation Exclusion essentially tracks the language in Minn. Stat. § 65A.01, subd. 3. *See Hackbarth v. State Farm Fire & Cas. Co.*, No. 11-cv-690 (DSD/FLN), 2013 WL 375543, at *3 (D. Minn. Jan. 31, 2013).

therefore, entitled to summary judgment. Because it is unnecessary to address whether coverage could properly be denied under the Intentional Acts Exclusion, the Court does not decide that issue.

## I.   Legal Standards

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Irvin v. Richardson*, 20 F.4th 1199 (8th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

10

inferences from the facts are jury functions, not those of a judge. . . ." *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

Because the parties have filed cross-motions for summary judgment, when the Court considers the Plaintiffs' motion, it views the record in the light most favorable to ICC, and when considering ICC's motion, it views the record in the light most favorable to Plaintiffs. *Durand v. Fairview Health Servs.*, 230 F. Supp. 3d 959, 965 (D. Minn. 2017), *aff'd*, 902 F.3d 836 (8th Cir. 2018).

The parties agree that the substantive law of Minnesota applies in this diversity dispute. *See Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 912–913 (8th Cir. 2014) (applying substantive law of Minnesota to insurance dispute where the parties did not disagree as to choice of law). The Court's task is to "predict how the Supreme Court of Minnesota would rule if the issue came before it." *Jerry's Enterprises, Inc. v. U.S. Specialty Ins. Co.*, 845 F.3d 883, 887 (8th Cir. 2017) (quotation marks omitted). Initially, the insured has the burden to show that coverage exists, and then the burden shifts to the insurer to demonstrate that a policy exclusion applies. *Id.* (citing *Friedberg v. Chubb & Sons, Inc.*, 691 F.3d 948, 951 (8th Cir. 2012)).

## II. Misrepresentation and Dishonesty Exclusions

### A. The Facts and the Policy Language

Applying the undisputed material facts of this case to the language of the Misrepresentation Exclusion and the Dishonesty Exclusion is a straightforward exercise that results in a straightforward outcome: ICC is entitled to judgment as a matter of law because the Policy provides no coverage. Start with the language of these exclusions.

11

Under the plain language of the Misrepresentation Exclusion, ICC does not provide coverage if, after a loss, an insured or its authorized representative willfully and with intent to defraud, concealed, or misrepresented any material fact concerning a claim under the Policy. Similarly, the Dishonesty Exclusion provides that ICC will not pay for loss caused by or resulting from the insured's dishonest acts, or those of its members, officers, or authorized representatives. And the Policy plainly provides that authorized representatives include members of an LLC and officers of a corporation.[5]

It is also straightforward how the undisputed facts of this case fit neatly within those exclusions. There is no genuine dispute that the named insureds are Timeless Bar and Horseshoe Club and that Andrew was an officer of one and a member of the other. A reasonable jury could only find that when Andrew acted on behalf of Timeless Bar and Horseshoe Club, his conduct fell within the plain language of the Misrepresentation Exclusion and the Dishonesty Exclusion.

Moreover, there is no genuine dispute that, after the fire, Andrew willfully and with intent to defraud ICC, concealed and misrepresented material facts concerning the Plaintiffs' insurance claim. He filed a fraudulent claim when he signed the original Proof of Loss on February 26, 2020, and the May 15, 2020 amended Proof of Loss. No reasonable jury could conclude otherwise based on this record.

---

[5] Plaintiffs concede that the language of these exclusions are not ambiguous and that their terms apply on their face, but as discussed in greater detail below, they argue that the exclusions must be reformed to be consistent with the standard Minnesota fire policy. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' SJ Mem.") at 17, 27–28 (Doc. 57).

Further, it is undisputed that Andrew was responsible for obtaining insurance and filing insurance claims on behalf of the businesses. He applied for the Policy at issue in this case on behalf of both Timeless Bar and Horseshoe Club. He signed the original fraudulent Proof of Loss on behalf of the businesses to submit the insurance claims on their behalf, and again prepared an inventory list in connection with an increased BPP claim that dishonestly indicated that the insured and the affiants had no idea what caused the fire. Even Jessie Welsh, the only other member of Horseshoe Club and the only other officer of Timeless Bar, admitted that Andrew was submitting the claim on behalf of the businesses. Jessie acknowledged that Andrew was responsible for handling applications for insurance for the businesses and the submission of any insurance claims. Viewing the evidence favorably to Plaintiffs, a reasonable jury could not find that Andrew did not submit these claims on behalf of Timeless Bar and Horseshoe Club.

Based on these undisputed facts, no reasonable jury could find that the Misrepresentation and Dishonesty Exclusions do not apply on their face to the facts of this case. Indeed, Timeless Bar and Horseshoe Club do not seriously dispute that (1) Andrew was an authorized representative of the corporation and the LLC, (2) he filed a fraudulent claim for insurance benefits, and (3) in doing so, he engaged in conduct that falls within the language of these two exclusions. Based on a careful review of the record, the Court finds that the Misrepresentation and Dishonesty Exclusions apply. But the Plaintiffs argue that, although the exclusions both appear to apply to the facts of the case, the Court should nonetheless conclude that coverage exists because the businesses are

"innocent insureds."[6] As explored below, none of Plaintiffs' efforts to avoid the plainly applicable exclusions succeed.

### B. *Hogs Unlimited*, *Watson*, and "Innocent Insureds"

Plaintiffs argue that, under Minnesota law, Andrew's conduct cannot be imputed to Timeless Bar and Horseshoe Club because they are "innocent insureds," and he is a stranger to the Policy. Plaintiffs argue that applying the Misrepresentation and Dishonesty Exclusions would mean that ICC's Policy provides less than the minimum coverage required by the statutory Minnesota standard fire insurance policy. Therefore, they contend ICC's Policy must be reformed to provide coverage for Timeless Bar and Horseshoe Club. Plaintiffs' innocent-insured theory is based on the Minnesota Supreme Court's decisions in *Hogs Unlimited v. Farm Bureau Mut. Ins. Co.*, 401 N.W.2d 381 (Minn. 1987) and *Watson v. United Servs. Auto Ass'n*, 566 N.W.2d 683 (Minn. 1997). But neither case supports Plaintiffs' position.

In *Hogs Unlimited*, three partners engaged in the business of raising hogs. All three partners (in addition to the partnership itself) were named insureds under a casualty policy providing coverage for the business's property. 401 N.W.2d at 382–83. One of the partners, Mr. Cerise, placed a hose in the hog barn and released a gas into the structure, resulting in the deaths of all 243 of the partnership's animals. *Id.* at 383. The three partners, Cerise included, then submitted a proof of loss to the insurer claiming that the insured property had been destroyed by an event of unknown origin. *Id.* While Cerise

---

[6] When Plaintiffs filed this case, Jessie was a named Plaintiff and Plaintiffs argued she was an "innocent insured." The Court rejected that argument and granted ICC's motion to dismiss Jessie as a named plaintiff. Order (Doc. 36).

engaged in a fraudulent scheme by destroying the hogs and filing the claim, the other two partners were unaware of his actions and committed no fraud. *Id.* The insurer denied their claim because of Cerise's fraud, and the other partners brought suit under the policy. *Id.* The trial court and appellate court found that the innocent partners could recover their proportionate share of the insurance proceeds, and when the insurer appealed, the Minnesota Supreme Court agreed.

The insurer argued that the coverage was voided by the policy's fraud exclusion, which, tracking language in Minn. Stat. § 65A.01, subd. 3, provided that the entire policy was void if, either before or after a loss, "*the insured* has willfully and with intent to defraud, concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or the interests of the insured therein." *Id.* at 384 (emphasis in original). The *Hogs Unlimited* court considered what the legislature meant "by the phrase 'the insured,'" and reasoned that it did not intend "to visit the blame of the errant insured on coinsureds who, having no control over the unauthorized conduct, are themselves blameless; nor do we think the legislature intended to make insureds their brother's keeper under penalty of losing their own insurance protection." *Id.* Accordingly, the court held "that the phrase 'the insured' refers to those persons responsible for the fraud, not to guilty and innocent insureds alike," so the policy was not voidable as to the two innocent partners who were also named insureds. *Id.* at 384–85. Further, the court held that Minnesota's public policy did not deny recovery of insurance proceeds to innocent partners. *Id.* at 385–86. Specifically, it held:

> [I]nnocent insured partners may recover their proportionate interest under the insurance policy for intentional destruction of their partnership property interest by another partner; provided, however, that (1) the destruction of the property was not within the scope of the wrongdoer's authority nor in furtherance of the partnership's business, and (2) payment of the insurance proceeds to the innocent partners can be accomplished to deny, in a practical manner, any appreciable benefit to the guilty partner.

*Id.* at 386.

In *Watson*, a named insured similarly destroyed property in an intent to defraud the insurer, and an innocent co-insured filed a claim. Elizabeth Watson and her estranged husband, Keith Watson, were both named insureds under an insurance policy that covered a mobile home that the couple owned until Keith intentionally burned it down. 566 N.W.2d at 684. Although Elizabeth was an innocent co-insured, the insurer denied her claim because the policy's plain language excluded coverage for intentional acts committed by "*an insured*," *id.* at 685–86 (emphasis added), policy language that differed from the "the insured" term found in the standard fire insurance policy and discussed in *Hogs Unlimited*. In *Watson*, the Minnesota Supreme Court first found that this policy language was unambiguous—it plainly precluded coverage to all insureds for intentional acts committed by *any* insured, including denying coverage to an innocent co-insured spouse for her estranged husband's arson. *Id.* at 688–89.

Next, the *Watson* court considered whether the unambiguous exclusion of coverage to an innocent co-insured spouse would provide less coverage than the minimum coverage required under the standard fire insurance policy in Minn. Stat. § 65A.01, subd. 3. *Id.* at 689–90. In light of the decision in *Hogs Unlimited*, the *Watson*

court concluded "that the legislature's use of 'the insured' in the Minnesota standard fire insurance policy evinces a general intent to compensate an innocent co-insured spouse despite the intentional acts of the other insured spouse."[7] *Id.* at 691. Accordingly, the court held that, "to the extent [the insurer's] policy purports to exclude innocent co-insured spouses from coverage, it must be reformed to comply with the Minnesota standard fire insurance policy." *Id.* at 692.

Although these cases could be read to require coverage in certain cases when one person acting alone commits a fraud or a tortious act, they do not require coverage in this case. Both *Hogs Unlimited* and *Watson* are concerned entirely with the situation where there are multiple named insureds on a policy, and one named insured engages in wrongful conduct that, absent some protection, would exclude coverage to an innocent co-insured. *Hogs Unlimited*, 401 N.W.2d 384–85 ("We hold that the phrase 'the insured' refers to those persons responsible for the fraud, *not to guilty and innocent insureds alike*.") (emphasis added); *Watson*, 566 N.W.2d at 692 ("We hold that, to the extent that USAA's policy purports to exclude innocent *co-insured spouses* from coverage, it must be reformed to comply with the Minnesota standard fire insurance policy.") (emphasis added). *Hogs Unlimited* interprets the phrase "the insured" in Minn. Stat. § 65A.01, subd. 3, and arrives at the conclusion that the legislature intended protection for named

---

[7] The *Watson* court was focused only on an "intentional loss" provision of the policy at issue in that case. However, it noted that subdivision 3 of the standard fire policy provided that intentional misrepresentations of "the insured" would defeat coverage, and observed that the *Hogs Unlimited* court had interpreted that language to bar recovery only as to the guilty insured, not innocent co-insureds. *Id.* at 691. In other words, it found the fact that it was addressing a different exclusion did not undermine its assessment of legislative intent concerning the required minimum coverage.

insureds. And *Watson* teaches that if an insurer replaces such "the insured" language with the phrase "an insured," that new phrase would unambiguously preclude recovery by an innocent co-insured, requiring reformation of the policy. Although Plaintiffs argue that in this case, "just like *Hogs Unlimited* and *Watson*, ICC is attempting to remove coverage from innocent insureds based on the acts of others" because "Mr. Welsh is not an insured" under the Policy,[8] neither case supports that argument. Neither *Watson* nor *Hogs Unlimited* holds that when an officer of a corporation or a member of an LLC engages in insurance fraud, his acts can never be imputed to the corporation or the LLC because doing so would deprive coverage to an innocent co-insured—the very business entity on whose behalf the individual has acted. In fact, neither case even considers the issue of when or under what circumstances the fraudulent submission of an insurance claim by a corporate officer or member of an LLC can be imputed to the business when applying a policy exclusion.

Just as that issue is absent from *Hogs Unlimited* and *Watson*, Plaintiffs point to no language in the Minnesota standard fire policy that precludes imputation of an agent's tortious acts to the agent's principal for purposes of determining whether a policy exclusion provides the minimum level of coverage required by Minnesota law. In relevant part, the provision of the standard fire policy analyzed in *Hogs Unlimited* and applied in *Watson* provides that a policy is voidable based on the fraudulent misrepresentations of "the insured." Minn. Stat. § 65A.01, subd. 3. This provision does

---

[8] Pls.' SJ Mem. at 21.

not state, or even imply that in the case of an insured corporation or LLC, the conduct of an agent authorized to act on behalf of the business cannot be imputed to the corporation.

Accordingly, the Court rejects Plaintiffs' argument that *Hogs Unlimited*, *Watson*, or Minn. Stat. § 65A.01, subd. 3 foreclose application of the Misrepresentation Exclusion or the Dishonesty Exclusion in this case.

### C. Imputation

Plaintiffs next argue that under Minnesota agency law principles, Andrew's fraudulent submission of insurance claims cannot be imputed to Timeless Bar and Horseshoe Club. Although neither party cites a Minnesota Supreme Court or Court of Appeals decision that is directly on point,[9] the Court disagrees with Plaintiffs' position for the reasons discussed below.

Minnesota recognizes that corporations and limited liability companies are "artificial entit[ies] which can only act through agents." *Nicollet Restoration, Inc. v. Turnham*, 486 N.W.2d 753, 754 (Minn. 1992) (corporation); *see also 301 Clifton Place LLC v. 301 Clifton Place Condo. Ass'n*, 783 N.W.2d 551, 560–61 (Minn. Ct. App. 2010) (finding that the rule from *Nicollet* applies to LLCs). The general rule is that the principal is bound by the agent's authorized actions, and the agent's knowledge is imputed to the principal. *St. Paul Fire & Marine Ins. Co. v. F.D.I.C.*, 968 F.2d 695, 700 (8th Cir. 1992). "In determining the corporation's tort liability, the intent of an agent or employee of the

---

[9] The Court's own research has not uncovered a case from Minnesota's appellate courts analyzing when an agent's submission of a fraudulent insurance claim can be imputed to the company for purposes of applying a policy's exclusions that are applicable to an insured corporation or other business entity.

corporation will be imputed to the corporation when the agent or employee 'acted on behalf of the corporation.'" *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 896–97 (Minn. 2006) (quoting 10 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corps.*, § 4877 (2002)); *St. Paul Fire & Marine Ins. Co.*, 968 F.2d at 700 ("The same is true of a corporate officer acting within the scope of his or her duty—the corporate officer's knowledge may be imputed to the corporation.") (citing *Brooks Upholstering Co. v. Aetna Ins. Co.*, 149 N.W.2d 502, 506 (Minn. 1967)). However, if an agent acts "adversely to the interest of the principal," then the agent's knowledge is not imputed to the principal. *Nat'l Credit Union Admin. Bd. v. CUMIS Ins. Soc'y, Inc.*, 241 F. Supp. 3d 934, 939–40 (D. Minn. 2017) (citing *Sussel Co. v. First Fed. Sav. & Loan Ass'n of St. Paul*, 238 N.W.2d 625, 627 (Minn. 1976)). This exception "applies only where the agent acts "solely for her own benefit," so it is not applicable "when an agent commits fraud that benefits the company at the expense of others." *Id.* (citing *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952 (N.Y. 2010) and Restatement (Second) of Agency § 282).

Applying these principles, the Court disagrees that the business entities in this case should somehow be exempt from the application of the exclusions simply because only one of their two officers or members took the actions that triggered that exclusion. Indeed, the consequence of the Plaintiffs' position would be that exclusions like those at issue could almost never be applied to corporate entities despite appearing to apply on their face—such a conclusion would rewrite all such policies and make little sense.

### 1. *Pioneer Industries*

First, the Court finds support in the Eighth Circuit's decision in *Pioneer Industries, Inc. v. Hartford Fire Insurance Co.*, 639 F.3d 461 (8th Cir. 2011) although it concerns a corporate officer's fraud in applying for insurance on behalf of his employer rather than submitting a fraudulent insurance claim. In *Pioneer Industries*, the CFO of the plaintiff corporation made misrepresentations to the insurer about the company's internal safeguards and auditing procedures when he applied for insurance coverage on behalf of the business. Applying Minnesota law, the *Pioneer Industries* court rejected the corporation's argument that the CFO was not acting on behalf of the business when he made the false statements. *Id.* at 467. The court found that the insurer could properly rescind or "avoid" the policy due to this misconduct. *Id.* ("Harlander was specifically authorized to purchase Pioneer's insurance, and thus any misrepresentations he made were attributable to Pioneer."); *id.* (citing *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967) ("[A] principal is liable for the deceit of his agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal.")).

Plaintiffs suggest that *Pioneer Industries* is distinguishable from this case for several reasons, none of them convincing. First, Plaintiffs assert that this case is different because the CFO in *Pioneer Industries* was authorized to purchase insurance for the corporation, so his misrepresentations were made in the course of his duties and were attributable to the corporation. Pls.' Opp'n at 17. But the same is true here—there is no dispute that Andrew was responsible for obtaining insurance coverage for the two

businesses and for filing claims on behalf of Timeless Bar and Horseshoe Club. Plaintiffs point to no evidence to suggest otherwise.

Second, Plaintiffs suggest that *Pioneer Industries* does not apply here because Andrew "was not specifically authorized by Plaintiffs to commit arson and lie about it to ICC." Pls.' Opp'n at 17. But the *Pioneer Industries* court's conclusion did not hinge on whether CFO's authorized conduct extended to the lies that he told in the insurance application. The court looked only to whether the general act of applying for and purchasing insurance on the company's behalf was within the course and scope of the CFO's duties. Here, it is undisputed that Andrew was authorized to file insurance claims for Timeless Bar and Horseshoe Club. No evidence suggests that Andrew was acting outside the course and scope of his duties to the corporation or the LLC when he submitted those claims.[10]

Third, Plaintiffs assert that there is no indication the *Pioneer Industries* court was asked to consider the Minnesota Supreme Court's decision in *Hogs Unlimited*. As a result, they suggest that *Pioneer Industries* fails to account for the protection afforded to innocent co-insureds and does not represent a fair prediction of how the Minnesota Supreme Court would rule in this case. *See* Pls.' Opp'n at 17–18. As discussed above,

---

[10] Plaintiffs contend that "Andrew Welsh's actions were not authorized by Plaintiffs and no facts suggest otherwise." Pls.' Opp'n at 18. The Court understands this to mean that Jessie Welsh—who was the only other officer, director, member, or authorized representative of either named Plaintiff—did not know about or authorize Andrew's arson or his decision to submit fraudulent claims on behalf of the businesses. Jessie acknowledged that Andrew was responsible for applying for insurance and filing claims for the businesses, and he was, at the time of the fire, if not exclusively responsible for the day-to-day operation of the businesses, then certainly their primary agent.

however, *Hogs Unlimited* did not hold that the actions of a corporate officer or an executive of an LLC cannot be imputed to the corporation for purposes of applying the misrepresentation exclusion under the Minnesota standard fire policy.

In addition, there is no evidence in the record from which a reasonable jury could conclude that Andrew was acting *solely* for his own benefit. Indeed, the undisputed facts show that he was attempting to obtain insurance proceeds for Timeless Bar and Horseshoe Club, not acting adversely to their interests.[11] Accordingly, no reasonable jury could conclude that Andrew Welsh was acting outside the course and scope of his employment when he made misrepresentations to ICC in submitting the fraudulent insurance claims. His misrepresentations are, therefore, imputed to Timeless Bar and the Horseshoe Club, and the Misrepresentation and Dishonesty Exclusions preclude coverage as a matter of law.

---

[11] This case differs from *CUMIS Ins.*, where the court found that there was a sufficient dispute of fact to send the issue of whether an exclusion applied to a jury. 241 F. Supp. 3d 934. In *CUMIS Ins.*, a manager applied for a fidelity bond for her company, and in the application, she stated that she was unaware of any act giving rise to a claim. However, this was a misrepresentation because she had embezzled $3 million from the corporation. Even though she was acting within the scope of her authority when she made the application for the fidelity bond, the court held that summary judgment for the insurer was not appropriate because her interests in not disclosing her theft were directly adverse to the interests of her employer, and she concealed the truth of her embezzlement for her own benefit. *Id.* at 941 ("But the Court reiterates the narrowness of its holding: it is only when an employee who acting adversely to her employer by embezzling from the company misrepresents her knowledge of that embezzlement on an application for fidelity insurance that the employee's knowledge will not be imputed to the company to allow the insurer to rescind the fidelity insurance"). The circumstances here are dissimilar—there are no facts in our record that would allow a reasonable jury to conclude that Andrew was acting solely for his own benefit when he filed the fraudulent claims on behalf of Timeless Bar and Horseshoe Club. Had he gotten away with the fraud, Plaintiffs would have benefited by being paid insurance benefits. *See id.* at 940 ("The exception does not apply when an agent commits fraud that benefits the company at the expense of others.").

2. ***Bloomington Steel***

Plaintiffs next argue that coverage can only be denied to Timeless Bar and Horseshoe Club if ICC can show that Andrew's business partner (Jessie) approved his filing of fraudulent claims or that his actions were foreseeable from the perspective of the corporation or the LLC. Pls.' Mem. in Opp'n to Def.'s Summ. J. Mot. ("Pls.' Opp'n") at 13–16. In support of this argument, Plaintiffs rely on *Travelers Indemnity Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888 (Minn. 2006). Plaintiffs' reliance on *Bloomington Steel* is misplaced.

*Bloomington Steel* addressed the issue of when "the intent or knowledge of an agent of a corporation may be imputed to the corporation for purposes of determining whether bodily injury inflicted by the agent upon a third party was expected or intended from the standpoint of the corporate insured." *Id.* at 891. In that case, Cecil Reiners started working for Bloomington Steel Corporation in 1968 and eventually became its sole shareholder, officer, and director in the early 1990s. *Id.* at 891–92. Bloomington Steel was insured by Travelers Insurance. *Id.* at 892. In October 2000, Jose Padilla was working for a different company in a workspace shared with Bloomington Steel, and Reiners assaulted him because he heard Padilla speaking Spanish instead of English. *Id.* Padilla sued Bloomington Steel for Reiners' assault after Padilla suffered a fractured skull and a severe brain injury. *Id.* Travelers brought an action seeking a declaratory judgment that it had no duty to defend Bloomington Steel for Reiners' tortious conduct under the relevant insurance policies. *Id.* at 893. The exclusions that Travelers argued applied required Padilla's injuries to be "unexpected and unintended by the insured" for

there to be coverage. *Id.* Because "[b]oth policies exclude coverage for bodily injury 'expected or intended from the standpoint of the insured,'" the *Bloomington Steel* court found that the issue was "whether Padilla's injuries were expected or intended from the standpoint of Bloomington Steel." *Id.* at 894.

In considering how to properly answer that question, the court first concluded that "the language of the . . . policies does not require that Reiners' intent be automatically imputed to Bloomington Steel" merely because he was the company's sole shareholder, director, and officer.[12] *Id.* at 894–95. Next, the court explained that "[a] corporation can be held liable for a tort just as a natural person can" and that a corporate agent's intent can "be imputed to the corporation when the agent or employee acted on behalf of the corporation." *Id.* at 896–97 (internal quotation marks omitted). The court looked to its prior cases, interpreting what it means for damage to be "expected" from the standpoint of an insured and explained that "[w]hether Bloomington Steel expected Reiners' assault of Padilla based on its actual or imputed knowledge of other incidents of violence will be a fact-specific determination" that would be judged by a standard of recklessness as

---

[12] The court found the language of the policy did not require imputation of Reiners' intent to the corporation based solely on his role in and control of the corporation, reasoning that the insurer "could have excluded coverage for bodily injury expected or intended from the standpoint of 'an' insured or 'any' insured." 718 NW.2d at 895. It noted that the policies at issue "also insured Bloomington Steel's stockholders, executive officers, directors, and employees," meaning that, at least under "certain conditions," Reiners was, himself, a named insured. *Id.* at 895 n.4. The court explained that in *Watson*, it held that such policy language would unambiguously prevent recovery by the corporation based on the acts of another insured, and unlike the provisions of Minn. Stat. § 65A.01 that rendered such a phrase unenforceable in *Watson*, "[t]here is no comparable standard [commercial general liability] policy language under Minnesota law and therefore such a clause in the policies issued . . . to Bloomington Steel would have been enforceable. . . ." *Id.* at 895.

opposed to negligence. *Id.* at 897 (discussing *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 735 (Minn. 1997)).

Although Plaintiffs argue that under *Bloomington Steel*, ICC must show that Andrew's actions (such as setting the fire or filing the fraudulent insurance claims) were foreseeable from the perspective of Timeless Bar and Horseshoe Club, they elide the specific context in which that foreseeability discussion arose. The *Bloomington Steel* court did not hold that an insurer's demonstration of foreseeability is always a prerequisite to imputing the intent of an agent to a principal for purposes of applying any policy exclusion—the court discussed foreseeability specifically because the policy exclusions at issue in *Bloomington Steel* required a determination of whether Bloomington Steel "expected or intended" Reiners' assault of Padilla. *See id.* at 894 (stating that "the question is whether Padilla's injuries were expected or intended from the standpoint of Bloomington Steel"). Neither the Misrepresentation Exclusion nor the Dishonesty Exclusion refer to injuries or losses that are "expected or intended" from the standpoint of the insured, so the Court need not consider whether any action taken by Andrew was "expected or intended" from the standpoint of Timeless Bar or Horseshoe Club. The language of the exclusions at issue in this case asks only whether the insured (through the acts of officers, shareholders, members, and authorized representatives) made material misrepresentations and engaged in dishonest acts. The foreseeability analysis undertaken in *Bloomington Steel* never enters the picture.

Otherwise, *Bloomington Steel* reinforces ordinary principles of agency law— including (1) that a corporation can be held liable for a tort just as a natural person can,

(2) that an agent's intent will be imputed to the corporation when the agent acted on the corporation's behalf, and (3) that the agent's knowledge and intent can be imputed to the corporation for the agent's acts that are committed in the course of the agent's employment and within the scope of the agent's authority. *Id.* at 896–97. As discussed above, there is no dispute that Andrew intended to file false claims with ICC to defraud the insurer, that he did so on behalf of Timeless Bar and Horseshoe Club, and that filing insurance claims for the corporation and the LLC was within the course of his employment and the scope of his authority.

Next, Plaintiffs argue that even if the Court were to apply "the 'dominant actor' theory pushed by ICC," questions of fact would preclude entry of summary judgment in ICC's favor because they have shown that Jessie Welsh had substantial duties for both companies.[13] They point out, for example, that Jessie was responsible for holding a food license without which the bar could not have operated, and they note that she provided a long list of the tasks she performed for the bar at various times after the businesses were formed in 2016. Pls.' Opp'n at 18–19; Pls.' SJ Mem. at 3–4. But this argument does not preclude summary judgment in favor of ICC. For one thing, the Court is not relying on

---

[13] Plaintiffs derive the so-called "dominant actor theory" (also referred to in their briefing as the "dominate actor theory") from *Bloomington Steel*. Pls.' Opp'n 13, 18. As noted above, the *Bloomington Steel* court rejected the insurer's argument that "Reiners' intent and expectations must be imputed to Bloomington Steel simply because Reiners was the sole shareholder, director, and officer of the company." 718 N.W.2d at 894. The court explicitly disagreed with the insurer's suggestion that when the control over the corporate entity is so complete by one agent of the entity, the intent and expectation must be imputed to the corporation." *Id.* (internal quotation omitted). Plaintiffs suggest that ICC has attempted to argue in this proceeding that because Andrew was solely in control of the corporation and LLC at the time of the fire, his intent and expectation must be imputed to the corporation, but such a position is foreclosed by *Bloomington Steel*. *See* Pls.' Opp'n 13–16.

any "dominant actor theory," whether it was actually advanced by ICC or not. And the Court does not find that Timeless Bar and Horseshoe Club are unable to obtain coverage because Andrew was exclusively in control of the bar. Instead, the Court finds that the undisputed facts show that Andrew made fraudulent claims to ICC on behalf of the Plaintiffs; filing insurance claims for the companies was within the course and scope of his employment and within his authority; and by filing the fraudulent claims on the companies' behalf, the Misrepresentation and Dishonesty Exclusions plainly prohibit coverage.

Moreover, Plaintiffs' arguments concerning Jessie's ongoing roles with the two businesses fail to identify a genuine dispute as to any *material* fact. Even if Jessie continued to be a part owner of the bar, a stakeholder and member of the real estate holding company, and maintained a food license that the bar needed to operate, these facts would not allow a reasonable juror to conclude that Andrew lacked the authority to file insurance claims on behalf of Timeless Bar and Horseshoe Club.

Accordingly, the Court finds that, even viewed in the light most favorable to Plaintiffs, Andrew's false statements in the proofs of loss submitted to ICC were dishonest acts and were made with intent to defraud ICC, and his actions are properly imputed to Timeless Bar and Horseshoe Club for purposes of applying the Misrepresentation and Dishonesty Exclusions.

### D. Conclusion

For the reasons discussed above, the Court finds that ICC is entitled to summary judgment. ICC's motion is granted and Plaintiffs' motion is denied. It is not lost on the

28

Court that this outcome works a certain unfairness to Jessie Welsh, who was by all accounts uninvolved in the arson and unaware of Andrew's fraudulent scheme. Even though the record demonstrates Jessie had become increasingly less involved in the day-to-day business and other affairs of the bar, she still held a significant interest in the corporation (490 shares out of 1,000) and was a 50% member in the LLC. Although the record is not entirely clear on this point, it seems that the fire destroyed the building and virtually all the bar's significant assets. Consequently, in addition to voiding the insurance coverage the businesses purchased to protect against losses, Andrew's conduct may have eliminated any business assets that Jessie could potentially have liquidated to satisfy the companies' remaining creditors or recoup her investment.

## III.    Intentional Acts Exclusion

The parties spill considerable ink arguing over whether the Intentional Acts exclusion can be applied in this case and whether (or to what extent) the Minnesota courts have adopted a so-called "corporate arson doctrine." Because the Court concludes above that ICC is entitled to summary judgment based on the Misrepresentation Exclusion and the Dishonesty Exclusion due to Andrew Welsh's undisputed submission of fraudulent insurance claims on behalf of Timeless Bar and Horseshoe Club, the Court expresses no opinion on these issues.

**CONCLUSION AND ORDER**

The undisputed material facts show that after he intentionally burned down the bar, Andrew Welsh filed fraudulent insurance claims with ICC on behalf of Timeless Bar and Horseshoe Club. He was authorized to file insurance claims on behalf of both of

29

those businesses and was acting within the course and scope of his employment when he did so. Accordingly, Andrew's actions are imputed to the Plaintiffs, the Misrepresentation Exclusion and the Dishonesty Exclusion preclude coverage as a matter of law, and ICC is entitled to summary judgment.

For the reasons set forth above, **IT IS HEREBY ORDERED THAT:**

1.      Plaintiff's Summary Judgment Motion (Doc. 55) is denied.

2.      Defendant's Summary Judgment Motion (Doc. 60) is granted.

3.      This matter is dismissed with prejudice.

**Let Judgment be entered accordingly.**

Date: May 21, 2024                              *s/Katherine Menendez*
                                                Katherine Menendez
                                                United States District Judge